UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETTY COLEMAN,

    Plaintiff,

v.

G4S SECURE SOLUTIONS (USA), INC.

    Defendant.

                                /

Case No. 16-10250

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

    This matter is before the Court on Defendant G4S Secure Solutions (USA), Inc.'s ("Defendant" or "G4S") motion for summary judgment. (Docket 18.) Plaintiff's claim arises from the termination of her employment by Defendant. Plaintiff brings a single claim against Defendant for retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (Compl. ¶ 1.) For the reasons stated below, the Court will grant Defendant's motion for summary judgment.

**I.    Background & Facts**

    Plaintiff was hired in late 2000 by non-party Pinkerton and assigned to perform security officer and dispatcher duties for Pinkerton's client General Motors ("GM") at the Tech Center. (Coleman Dep. 11-13, Pl.'s Resp. Ex. 2, dkt. 17-3.) The Tech Center includes both an East and West Campus housing multiple buildings, where thousands of GM employees and contractors work each day. (*Id.* at 13-14; Drent Dep. 44, Def.'s Mot. Summ. J. Ex. 15, dkt. 15-16.)

In 2001, Securitas acquired contracts to provide security at the Tech Center. Several Pinkerton employees, including Plaintiff and Donald Drent, then a division manager, continued their employment with Securitas. (Drent Dep. 20-21.) In approximately 2004 or early 2005, Plaintiff was promoted to supervisor, and shortly thereafter, promoted to the position of Site Coordinator for the East Campus of the Tech Center. (Coleman Dep. 16, 19-20.) In 2011, the security contract was awarded to G4S. (Drent Dep. 21.) Again, some employees, including Plaintiff and Drent, were hired by the new company, G4S, and continued performing the same job duties. (Drent Dep. 21-22; 62.)

At the Tech Center, one Site Coordinator was responsible for managing the West Campus and two Site Coordinators were responsible for managing the East Campus. (Coleman Dep. 63-65.) As a Site Coordinator, Plaintiff was responsible for managing approximately 60 people working on three different shifts in multiple buildings. (Coleman Dep. 19-21.) Shift Supervisors report to the Site Coordinator. (Coleman Dep. 19-20, 239, 240.) Plaintiff's job duties as a Site Coordinator included keeping "G4S and GM Plant management informed on the status of emergency situations" and ensuring "subordinates respond proactively and appropriately," ensuring "GM/G4S policies and procedures are updated, implemented and adhered to," and notifying "proper authorities and client in emergency situations."(Job Description, Pl.'s Resp. Ex. 9; Coleman Dep. 23-24.)

At the time that G4S secured the GM security contract, Jeremy Paul ("Paul") was the Security Chief for the East Campus and was Plaintiff's immediate supervisor. (Coleman Dep. 56-59; Drent Dep. 34-35.) In mid-2013, G4S underwent a structural reorganization wherein Drent became the immediate supervisor of the Tech Center Security Chiefs and became the second-level supervisor of the Site Coordinators, including Coleman. (Drent

Dep. 29.) GM's Global Security Division ("GSD") is GM's in-house security department and is responsible for overseeing all security and fire prevention at GM. (Drent Dep. 48, 70.) Beth Webster was the GSD Manager responsible for working with GM's security provider during the time periods relevant to this lawsuit. (Drent Dep. 48, 70; Coleman Dep. 54.)

On or about March 7, 2014, Paul directed Plaintiff to "write up" or discipline security officer Marcus Pope ("Pope"), whom Paul alleged had made an insulting statement to a female officer, Michelle Dixon ("Dixon"), about a blazer Dixon was wearing. (Compl. ¶¶ 10-14.) Plaintiff told Paul that she would talk to Dixon to find out if Dixon had been insulted, before she would proceed with disciplining Pope. (Compl. ¶ 15.) Plaintiff proceeded to interview Dixon and other witnesses who had been present, including DeYana Wagner. (Compl. ¶¶ 18, 22.) Plaintiff determined that Paul had not actually been present during the interaction, but had observed it via security camera. (Comp. ¶¶ 19-20, 24.) Plaintiff also found out that Paul had sent a photo of a pink Power Ranger to Wagner, with a reference to Dixon and the Blazer. (Compl. ¶ 25.) During this questioning, Dixon, Wagner and another female security guard, LaToya Naylor, alluded to inappropriate comments, including sexual comments, made by Paul to them. (Compl. ¶¶ 26-31.) Paul's comments had not previously been reported. (Compl. ¶¶ 31-32.)

Plaintiff notified Human Resources ("HR") manager Juanita Resar ("Resar") that three of her subordinates had been subjected to sexual comments from Paul, and Resar told Plaintiff to "do what you usually do, get your paperwork together and get it to me." (Coleman Dep. 184, 195.) On March 11, 2014, Plaintiff obtained written statements from Dixon, Wagner and Naylor regarding Paul's comments and submitted the statements to Resar. (Compl. ¶¶ 40, 42.) Plaintiff did not speak with Paul about the allegations. (Coleman

3

Dep. 184:22-24.) Drent became involved in the investigation due to his concerns about the propriety of an investigation by a subordinate of a supervisor. (Drent Dep. 92.) Paul was suspended until the end of the investigation. (Drent Dep. 108.) As a result of the investigation, Paul was ultimately issued a Final Written Warning and was retrained on the company's sexual harassment policy prior to being reinstated as the East Campus Security Chief. (Paul Dep. 108-11, Pl.'s Resp. Ex. 5; Drent Dep. 123-26.) Further, any disciplinary authority over Naylor, Dixon, Wagner or Coleman was taken from Paul, in part to avoid an issue of retaliatory activity by him against those individuals. (Drent Dep. 126.)

During the investigatory process, Drent's assistant, Scott Saunders ("Saunders"), allegedly contacted Plaintiff. (Compl. ¶ 44.) Saunders was angry that Plaintiff had conducted an investigation of Paul for sexual harassment and, per the Complaint, asked Plaintiff, "Who in the hell you think you are to investigate someone higher than you?" (Compl. ¶ 44.) Saunders had also completed an investigative report of Paul's conduct, dated March 19, 2014, in which his conclusions included both that Plaintiff "did not follow protocol throughout this process" and that "it would be difficult for Jeremy Paul to continue at this facility as an effective security manager, leader, or mentor." (Record of Investigation, Mar. 19, 2014, Pl.'s Resp. Ex. 6.)

On or about May 16, 2014, G4S security officer Sam Smith ("Smith") made a complaint to Coleman about Naylor, alleging that she had yelled at him in front of guests. (Coleman Dep. 213-15; Security Incident Rep., Def.'s Mot. Summ. J. Ex. 10, dkt. 15-11.) Naylor had already been written up on at least one other occasion, for an unprofessional verbal altercation with a member of the housekeeping staff, in which Naylor called that person a "hood rat." (Coleman Dep. 305-06.) On May 20, 2014, Naylor reported to

4

Coleman that Smith was watching television on his cell phone while at work and not completing his security patrols. (Coleman Dep. 223; Smith Removal Documentation, Def.'s Br. Ex. 12, dkt. 15-13.) There was an investigation of Smith and the alleged falsification of his documents and Plaintiff was given approval to remove Smith. (Coleman Dep. 249; Smith Removal Documentation, Def.'s Br. Ex. 12.)

On the evening of June 18, 2014, Naylor and Smith engaged in a second verbal workplace altercation. (Coleman Dep. 224-25; Security Incident Reports, Pl.'s Resp. Ex. 7.) Third shift supervisor Sean Shields called Plaintiff to notify her of the incident. (Coleman Dep. 225.) Plaintiff directed Shields to take statements from Smith, Naylor and any witnesses, make sure Smith and Naylor were separated, and to let Smith go home when he finished his statement, because it was the end of his shift. (Coleman Dep. 226-27, 229.) Shields' call to Plaintiff came before midnight, and Plaintiff did not go back to work to interview anyone about the incident because she had just finished working 13 hours. (Coleman Dep. 227.) Plaintiff also directed Shields to call Paul and inform him about "what's going on." (Coleman Dep. 229.) Plaintiff herself tried to contact Paul "over eight times" about the incident, calling his desk phone, cell phone and leaving voice mails. (Coleman Dep. 238, 272; Drent Dep. 143, dkt. 15-16.) Plaintiff testified that she did not know whether a workplace GRIT (Global Reporting Incident Tool) report needed to be completed when there is a workplace violence incident because she had "never experienced it." (Coleman Dep. 206, 238-39.) Plaintiff believed that duty fell on the shift supervisor, and agreed that if the shift supervisor did not complete a GRIT, then she had to follow-up behind the shift supervisor and do a GRIT report. (Coleman Dep. 240.)

Plaintiff did not speak with Naylor the following day, but she intended to speak with Naylor when she had the next opportunity and did not believe the incident was urgent (Coleman Dep. 244.) On June 19, Plaintiff removed Smith from employment, telling him that it was a follow-up for his falsifying of documentation (related to the television watching at work, for which Naylor had reported him). (Coleman Dep. 259.) Plaintiff had already planned to get rid of Smith before the second incident with Naylor occurred. (Coleman Dep. 279.) Plaintiff did not interview Smith about the incident with Naylor, nor did she interview anyone else, other than a single GM employee, on June 19th. (Coleman Dep. 260-63.) Plaintiff admitted that if she had interviewed Naylor and Naylor had admitted to those things that had been reported in relation to the incident, Plaintiff would have requested permission to suspend her. (Coleman Dep. 279.) Naylor was ultimately terminated for the incident with Smith. (Coleman Dep. 306.)

On June 20, 2014, Drent received a phone call from Webster, of GSD, inquiring about an incident between two officers that was an altercation, to which security officers had to physically respond to the location and separate the parties, as had been reported to Webster by a GM employee. (Drent Dep. 138-39.) Drent did not know about the incident and Webster inquired as to why he did not know about it. (Drent Dep. 138.) Drent called both Landen Pickens and Paul to inquire whether they knew anything about such an incident, then he drove to the Tech Center to follow up. (Drent Dep. 139.) When Drent found out about the incident and questioned Plaintiff about why she didn't respond when she received the call the night of the incident, she told him that she was "too tired." (Drent Dep. 143.) She acknowledged that when the call came, she had just gotten home from work, was exhausted, and intended to address the incident the following morning. (Pl.'s

Resp. 8, citing Coleman Dep. 283-84.) In the Complaint, Plaintiff admits she could have suspended Naylor immediately, rather than waiting to interview her first. (Compl. ¶ 56.) Plaintiff did not contact Drent, Saunders or the client about the incident. (Coleman Dep. 248-49, 252.) Drent suspended Plaintiff Coleman pending an investigation into the handling of the Naylor-Smith incident; it was an investigatory suspension similar to that imposed on Paul during the course of the investigation of the sexual harassment allegations against Paul. (Drent Dep. 154, 160-61.) After receiving the investigation reports and all statements, including Plaintiff's statement, Drent made the decision to terminate Plaintiff. (Drent Dep. 162.)

On July 9, 2014, Coleman filed an Equal Employment Opportunity Commission ("EEOC") charge with the Michigan Department of Civil Rights (MDCR) alleging that she was terminated in retaliation for her investigation of sexual harassment allegations made against Paul by her three subordinate employees approximately four months earlier. (Pl.'s Resp. Ex. 10.) The MDCR dismissed the complaint after investigation and the EEOC adopted the MDCR findings and issued a Dismissal and Notice of Rights on October 23, 2015. (Pl.'s Resp. Ex. 10.) Plaintiff filed this action on January 25, 2016.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Rule 56 also provides that

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

### III. Analysis

#### A. Whether Plaintiff Can Establish A *Prima Facie* Claim Of Retaliation

##### 1. Whether Plaintiff Engaged In A Protected Activity

Under Title VII, it is unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000e-3(a). Plaintiff offers circumstantial evidence of discrimination and her claim is therefore analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). First, Plaintiff must establish a *prima facie* case of retaliation. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). If Plaintiff does so, the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for its action. *See Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009). If Defendant meets its burden, the burden then shifts back to the Plaintiff to show that the reason provided by the Defendant was not the true reason for the adverse action, and was "mere pretext." *Id.*

To establish a *prima facie* case of retaliation, Plaintiff must show four elements:

> (1) [T]he plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

9

*Fuhr*, 710 F.3d at 674. Plaintiff alleges that her investigation of sexual harassment allegations against Paul in March 2014 was the reason that she was terminated approximately four months later. She argues that her investigation of the allegations while performing her job duties does not, by itself, make the activity non-protected, and that her submission of the complaints to HR manager Resar is "undoubtedly protected." (Pl.'s Resp. 12-13.) Plaintiff points out that Title VII protection extends to opposition to unlawful practices expressed internally, even before the filing of an EEOC charge. *See generally Coleman v. Wayne State University*, 664 F. Supp. 1082, 1092 (E.D. Mich. 1987).

There is no dispute that Defendants knew that Plaintiff had undertaken an investigation of the sexual harassment complaints against Paul and that the termination of Plaintiff's employment is an adverse employment action. Defendant argues that Plaintiff was not engaged in a protected activity because it is undisputed that Plaintiff was a member of management and that her duties included investigating employee concerns, including sexual harassment complaints. (Coleman Dep. 195-96.) Defendant relies on *Lewis-Smith v. Western Kentucky University* for its holding that the plaintiff had not engaged in a protected activity by investigating another employee's discrimination complaints where such an investigation was part of the plaintiff's job duties. *See Lewis-Smith v. Western Kentucky Univ.*, 85 F. Supp. 3d 885, 908-09 (W.D. Ky. 2015). In *Lewis-Smith*, the plaintiff appeared to claim "that she engaged in protective (sic) activity on behalf of others for which she received hostile treatment and retaliation." *See id.* at 908. The plaintiff listed in her pleadings "various other employees' grievances against [d]efendant, and her alleged involvement with those grievances, if any." *Id.* As the *Lewis-Smith* court

pointed out, other courts have grappled with the issue of claims of retaliation by employees in human resources. *See id.* at 909. One court reasoned that adopting the plaintiff's position—implicitly "that she is entitled to special protection because she had knowledge of numerous personnel issues and complaints by others by virtue of her position in the HR Department and as a member of Staff Council"—"would render practically all of [the plaintiff's] work activities and work product subject to Title VII protection." *Id.* (quoting *Correa v. Mana Prods., Inc.*, 550 F. Supp. 2d 319, 330–31 (E.D.N.Y.2008)).

*Lewis-Smith* relies in part on reasoning from the Tenth Circuit to note that "[i]n order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment." *Id.* at 909 (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996)). In *McKenzie v. Renberg's Inc.*, the court considered an employee's claim that she was retaliated against for notifying the company attorney and company president that she was concerned that the company may be in violation of certain wage and hour laws. *See McKenzie, 94 F.3d at* 1481. The plaintiff was the personnel director at the company and was "responsible for monitoring compliance with state and federal . . . wage and hour laws, and other laws regulating the workplace." *Id.* at 1481. With respect to the retaliation claim, the *McKenzie* court noted that "we have never held that an employee is insulated from retaliation for participating in activities which are neither adverse to the company nor supportive of adverse rights under the statute which are asserted against the company." *Id.* at 1486.

> [The plaintiff] McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal

> complaint about the wage and hour practices of her employer and asserting a right adverse to the company. McKenzie did not initiate a FLSA claim against the company on her own behalf or on behalf of anyone else. Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations. In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

*Id.* at 1486-87. The court concluded that the plaintiff had not engaged in protected activity, and thus disposed of the plaintiff's retaliation claim. *See id.* at 1487; *see also Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 Fed. Appx. 524, 530 n.2 (6th Cir. 2011) (citing *McKenzie*, 94 F.3d at 1486-87, and noting that "[w]hile the Sixth Circuit has not addressed the issue of distinguishing job performance from protected activity, district courts within the Circuit have come to the conclusion that complaints within the scope of one's job duties cannot be protected activity").

The Second Circuit in *Littlejohn v. City of New York*, shed additional light on "protected activity" in the context of an employee who, as part of his or her job duties, reports or investigates other employees' complaints of discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015). The *Littlejohn* court looked to *Crawford v. Metropolitan Government of Nashville & Davidson County*, in which the Supreme Court clarified that "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." 555 U.S. 271, 276 (2009) (extending Title VII protection to an "employee who speaks out about discrimination not on her own

initiative, but in answering questions during an employer's internal investigation."). *LIttlejohn* points out that *Crawford* did not restrict its holding to "non-managers or to employees whose job responsibilities are untethered to monitoring discrimination or enforcing non-discrimination policies." *Littlejohn*, at 318. Yet even in light of *Crawford*, *Littlejohn* acknowledges that

> There is a significant distinction between merely reporting or investigating other employees' complaints of discrimination, which simply fulfills a personnel manager's daily duties, and communicating to the employer the manager's own "belief that the employer has engaged in ... a form of employment discrimination," which "virtually always constitutes" opposition notwithstanding the employee's underlying job responsibilities.

*Littlejohn*, at 318 (quoting *Crawford*, 555 U.S. at 276 (internal quotation marks omitted)).

Plaintiff attempts to distinguish *Lewis-Smith* by arguing that the *Lewis-Smith* plaintiff was in human resources and therefore tasked with investigating all Title VII complaints. Plaintiff points out that she is not in human resources and her investigation of Paul came about from investigating a tangential matter. (Pl.'s Resp. 12.) Plaintiff argues that the Site Coordinator job description does not include a duty to investigate Title VII complaints. (Pl.'s Resp. 12, Ex. 9.) To support her argument she relies on Saunders' reaction to her investigation, asking her "who in the hell" she thinks she is, "to investigate someone higher" than herself, and Drent's deposition testimony that he became involved in the investigation due to concerns about the propriety of an investigation by a subordinate of a supervisor. (Compl. ¶ 44, Drent Dep. 92.) Yet Plaintiff testified that when she told Resar that three of her subordinates had been subjected to sexual comments, Resar told her to "do what you usually do, get your paperwork together and get it to me." (Coleman Dep. 195-96.) Plaintiff

13

had each employee complete a GRIT form, and Plaintiff also took interview notes on a form of her own creation, explaining that "[w]e created our own investigation questions regarding whatever investigation it is." (Coleman Dep. 195-96.)

The Court finds that Plaintiff has not shown a genuine issue of material fact that she was acting other than in her capacity as a supervisor in conducting an investigation into the allegations by her subordinates against Paul. In investigating, she did what she "usually" does, and her investigation of Paul initially came about from fulfilling her managerial duties in dealing with another issue. Yet even if there were a question of fact as to whether Plaintiff was involved in a protected activity by engaging in the investigation of a supervisor, Plaintiff has not shown a question of fact as to causal connection or pretext, as set forth below.

### 2. Whether There Is A Causal Connection Between Plaintiff's Protected Activity And Her Termination

"[A] plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Med. Crt. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("The proper interpretation and implementation of § 2000e–3(a) and its causation standard have central importance to the fair and responsible allocation of resources in the judicial and litigation systems. This is of particular significance because claims of retaliation are being made with ever-increasing frequency.") "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533. Defendant argues that Plaintiff has already conceded that the

investigation of the harassment claims was not the "but-for" cause of her termination. Plaintiff testified that she believed her termination was both because Drent believed that Plaintiff exhibited favoritism toward Naylor, and because she investigated the harassment claims against Paul. (Coleman Dep. 308-09.)

Here, Plaintiff relies on the temporal relationship between her investigation of Paul and her termination, nearly four months later. Under the "but-for" causation standard here, however, temporal proximity alone is not enough. *See Williams v. Serra Chevrolet Auto., LLC*, 4 F. Supp. 3d 865 (E.D. Mich. 2014) (*comparing Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir.2008) and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174 (2009)). As Defendant points out, there is no evidence that Defendant took any disciplinary action against Plaintiff in the months between the harassment investigation and the termination.

Plaintiff also argues that there is evidence that Defendant was unhappy with her having engaged in the investigation of Paul. To the extent Plaintiff cites Saunders' statement asking her who she thinks she is to investigate someone higher than herself, there is no dispute that Saunders was not in Plaintiff's chain of command, he was not involved in the decision to terminate Plaintiff, the comment was not made in relation to Plaintiff's termination, and the comment was not proximate in time to the termination. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008); *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994) (setting forth standards to consider when examining statements "allegedly showing employer bias"). Plaintiff also alleges Drent disapproved of her investigation of a superior. For example, Drent contacted the vice

president of diversity and inclusion and discussed with her that he "felt that that was mishandled in relationship to having a subordinate formulate an investigation based upon allegations of the employees against a particular supervisor and that it should have been a person of higher level of management than the two individuals that conducted that investigation that weren't directly in the chain of command of each other." (Drent Dep. 92.) Again, there is nothing to suggest that Drent's expression of concern was related to the later decision to terminate Plaintiff. While Plaintiff argues that this evidence raises an inference that Defendant would be motivated to take action adverse to Plaintiff, this is a stretch at best without more.

Plaintiff admits her belief that there was more than one reason that she was terminated, and one of the reasons she gives, the belief that she showed favoritism to Naylor, is related to Defendant's proffered reason for her termination: the handling of the Smith-Naylor incident in June 2014. (Coleman Dep. 308-09.)  Plaintiff has not shown enough to create a genuine issue of fact on the but-for causation element of her *prima facie* case of retaliation. Even if Plaintiff had satisfied her burden on this element, she cannot defeat Defendant's motion for summary judgment. Defendant has offered a legitimate, non-retaliatory reason for Plaintiff's termination and she has not presented evidence by which a reasonable juror could conclude that this reason was pretext for retaliation.

**B.  Whether Plaintiff Can Establish Pretext**

If Plaintiff had established a *prima facie* case of retaliation, the burden would then shift to Defendant to provide a legitimate, non-retaliatory reason for her termination. Plaintiff concedes that Defendant "has presented a reason for her termination that is legitimate and

non-retaliatory on its face." (Pl.'s Resp. 14.) Defendant has shown that Plaintiff was terminated for her failure to respond to and report the Smith-Naylor incident. Therefore, the burden shifts back to Plaintiff to show that Defendant's given reasons are pretext for a retaliatory action. *See generally Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007).

To show that Defendant's reasons were actually "a pretext to hide unlawful retaliation," Plaintiff must "produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Id.* Plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* A dispute over the facts underlying the termination is not enough to defeat summary judgment "as long as an employer has an honest belief in its proffered nondiscriminatory reason." *Id.* at 598 (citation omitted). "The key inquiry in assessing whether an employer holds such an honest belief is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id.* (citation omitted). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* (citation omitted).

Here, Plaintiff identifies no evidence that Defendant's proffered reason for her discharge was false or was a pretext for retaliation. *See Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004); *Ladd v. Grand Trunk Western RR, Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). First, there is no evidence to suggest that Defendant's proffered reason is not based in fact. Plaintiff herself admitted how she did not follow-up and did not

17

notify individuals regarding the Smith-Naylor verbal altercation, and she admitted that she did not do so because she was tired. (Drent Dep. 143; Pl.'s Resp. 8; Coleman Dep. 283-84.) She also admitted that she could have suspended Naylor, who had already received a warning for another verbal altercation. (Compl. ¶ 56; Coleman Dep. 304-06.) Plaintiff attempts to establish pretext by arguing that the facts were mischaracterized, that the Smith-Naylor incident was not really violent or an "emergency" at all. She argues that the GM and G4S handbooks define workplace violence as involving threats or physical harm. (Pl.'s Resp. 15.) Yet Plaintiff concedes that the incident "involved shouting and profanity" and this was the second incident between these two employees. (Pl.'s Resp. 7, 15.)

Second, Plaintiff identifies no evidence on which a jury could find that Defendant's proffered reason did not actually motivate her termination. She testified that she believes the termination was based on two things: showing favoritism toward Naylor and the sexual harassment investigation. (Coleman Dep. 309.) Plaintiff admits that nobody told her that she was terminated in part due to the sexual harassment investigation; her belief is based on a "gut feeling." (Coleman Dep. 309.)

Third, despite Plaintiff's argument that the Smith-Naylor incident did not really constitute an emergency requiring specific action or response from her, there is no material question of fact that Plaintiff's conduct was sufficient to warrant termination. A dispute about whether or not this constituted an "emergency" does not overcome Defendant's "reasonable reliance" on the facts before it when it made a decision to terminate Plaintiff and the Court does not second guess Defendant's business judgment. Defendant conducted an investigation of the incident on which it based the termination, including

reviewing video footage, obtaining written statements and questioning Plaintiff. (Drent Dep. 139-54.) Defendant made a reasonably informed decision before terminating Plaintiff. Defendant also points out that Plaintiff had many years of experience and was aware of GM's emergency protocols and her job's requirement that she keep "G4S and GM management informed on emergency situations." (Coleman Dep. 23-24, 88-91; Job Description, Def.'s Br. Ex. 2; Pl.'s Resp. 9.)

Finally, to the extent that Plaintiff makes an argument that the "vast disparity of discipline handed down to Paul and Coleman regarding their respective investigations" is evidence of pretext, the two individuals are not similarly situated. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000). "To be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* at 762 (citation omitted). And while "[e]xact correlation is not required," they "must be similar in 'all relevant aspects.'" *Id.* Plaintiff has not demonstrated that she and Paul were similarly situated. They had different titles and therefore different responsibilities. (Coleman Dep. 56-59; Drent Dep. 35, 38-39.) Plaintiff has not shown that Paul engaged in a protected activity. The conduct for which Paul was investigated and reprimanded was not the same conduct for which Plaintiff alleges she was terminated: retaliation for engaging in a protected activity. Nor was Paul's conduct the same conduct of Defendant's proffered reason for terminating Plaintiff: a failure to perform job duties. As Defendant also points out, there is evidence that the Defendant's client, GM,

inquired about the communication failure surrounding the Smith-Naylor incident, when Webster called Drent seeking further information about the incident, which had been reported to Webster by a GM employee. (Drent Dep. 138-39.) Defendant's disciplinary action, or lack thereof, against Paul is not evidence of pretext. Plaintiff has failed to identify evidence that would raise a material question of fact as to whether Defendant's proffered reason for terminating her was pretext.

## IV.  CONCLUSION:

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment and dismisses Plaintiff's Complaint.

**SO ORDERED.**

      s/Nancy G. Edmunds
      Nancy G. Edmunds
      United States District Judge

Dated:  December 27, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 27, 2016, by electronic and/or ordinary mail.

      s/Carol J. Bethel
      Case Manager